UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| ERIC G. FOX, | |
| Plaintiff, | Case No. 2:22-cv-00024 |
| v. | Chief Judge Waverly D. Crenshaw, Jr. |
| SOCIAL SECURITY ADMINISTRATION, | Magistrate Judge Alistair E. Newbern |
| Defendant. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief District Judge

**REPORT AND RECOMMENDATION**

  Pro se Plaintiff Eric G. Fox filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his application for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. (Doc. No. 1.) The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 3.) Fox filed a motion for judgment on the administrative record (Doc. No. 25), to which then-Acting Commissioner of Social Security Kilolo Kijakazi (Commissioner) responded in opposition (Doc. No. 29).[1] Having considered the parties' arguments and the administrative record (Doc. No. 18), the Magistrate Judge will recommend that the Court deny Fox's motion for judgment on the administrative record and affirm the Commissioner's decision.

---

[1]  The Senate confirmed Martin O'Malley as Commissioner of the Social Security Administration on December 18, 2023.

# I.    Background

## A.    Fox's Prior DIB Application

Fox was involved in a serious motorcycle accident on March 6, 2004. *Fox v. Astrue*, No. 5:09-cv-376, 2010 WL 3220217, at *2 (M.D. Fla. Aug. 13, 2010). He previously applied for DIB alleging that he had been disabled and unable to work since the date of the accident "due to a shattered tibia plateau, bad knee[,] and depression." *Id.* The Commissioner denied the DIB application initially and on reconsideration. *Id.* at *1. At Fox's request, an administrative law judge (ALJ) held an administrative hearing regarding his application and "issued a [written] decision partially favorable to" Fox, finding that Fox was disabled and unable to work from March 6, 2004, through October 5, 2005, but that the period of disability ended because Fox "experienced medical improvement beginning on October 6, 2005[,] related to his ability to work." *Id.* at *1, *7. The Social Security Appeals Counsel denied Fox's request for review, making the ALJ's decision the final decision of the Commissioner regarding Fox's first DIB application. *Id.* at *1. Fox filed an action for review under § 405(g) with the assistance of counsel in the U.S. District Court for the Middle District of Florida, and that court affirmed the Commissioner's decision. *Id.* at *15.

## B.    Fox's Current DIB Application

Fox filed a new DIB application on March 2, 2017, alleging that he has been disabled and unable to work since July 17, 2007, as a result of depression, an artificial right knee, bulging discs in his neck, osteoarthritis, chronic fatigue syndrome, carpal tunnel syndrome, chronic pain syndrome, lower back pain, and damage to his right leg. (AR 126–127.[2]) The Commissioner denied Fox's application initially and on reconsideration. (AR 125, 146.) At Fox's request, an ALJ

---

[2]    The transcript of the administrative record (Doc. No. 18) is referenced herein by the abbreviation "AR." All page numbers cited in the AR refer to the Bates stamp at the bottom right corner of each page.

held a hearing on his DIB application on October 18, 2018. (AR 32–89, 161–162.) Fox appeared and testified without an attorney or representative. (AR 34–74.) The ALJ also heard testimony from vocational expert Leta Berkshire. (AR 75, 79–86.)

### C.     The ALJ's Findings

On February 20, 2019, the ALJ issued a written decision finding that Fox was not disabled within the meaning of the Social Security Act and applicable regulations and denying his claim for DIB. (AR 13–25.) The ALJ made the following enumerated findings:

1.     The previous ALJ's decision is not final and binding, as the claimant has rebutted the presumption of continuing non-disability.[3]

\*          \*          \*

2.     The claimant last met the insured status requirements of the Social Security Act on December 31, 2007.

\*          \*          \*

---

3          On this point, the ALJ found that:

Acquiescence Ruling 97-4(9) holds that when there is a final decision by an ALJ that a claimant is not disabled, there is a presumption of continuing non-disability unless the claimant rebuts the presumption. A claimant may rebut the presumption by showing a "changed circumstance" affecting the issue of disability with respect to the adjudicated period—e.g., a change in the claimant's age category, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment not previously considered, or a change in the criteria for determining disability.

Turning to the current claim, there has been a showing of a changed circumstance material to the determination of disability, and the presumption of continuing non-disability has been rebutted, because the mental listings regulatory criteria have changed. The lack of res judicata consideration to the prior decision does not amount to any kind of reopening. As demonstrated in Social Security Ruling 68-l2a, the concepts of reopening and res judicata are distinct. As noted, the prior decision is not reopened.

(AR 15–16.)

3.     The claimant did not engage in substantial gainful activity during the period from his alleged onset date of July 17, 2007 through his date last insured of December 31, 2007 (20 CFR 404.1571 *et seq.*).

4.     Through the date last insured, the claimant had the following severe impairments: status post-open reduction and internal fixation (ORIF) of the right tibia and fibular, knee arthroplasty, degenerative disc disease of the cervical region of the spine, mild carpal tunnel syndrome (CTS), and affective disorder (20 CFR 404.1520(c)).

*     *     *

5.     Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

*     *     *

6.     After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform than [*sic*] the full range of light work as defined in 20 CFR 404.1567(b). He could lift and carry 20 pounds occasionally and 10 pounds frequently. He could stand[ ] and walk[ ] for 2 out of 8 hour[s] and sit for 6 of 8 hours. He could perform all postural activities occasionally. He had to avoid concentrated exposure to vibration and hazards. He could handle and finger frequently. He could maintain concentration, persistence, and pace for simple and detailed instructions and tasks consistent with unskilled work up to SVP-2, which means the work can be learned in 30 days or less.

*     *     *

7.     Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

*     *     *

8.     The claimant was born on April 3, 1955 and was 52 years old, which is deemed as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

9.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

\*       \*       \*

12.     The claimant was not under a disability, as defined in the Social Security Act, at any time from July 17, 2007, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

(AR 15–25.)

The Social Security Appeals Counsel denied Fox's request for review on March 5, 2020, making the ALJ's decision the final decision of the Commissioner. (AR 3–5.) At Fox's request, the Social Security Appeals Counsel extended the time for Fox to file a civil action challenging the Commissioner's final decision. (AR 1–2.)

**D.      Appeal Under 42 U.S.C. § 405(g)**

Fox filed this action for review of the ALJ's decision pro se on June 9, 2022, and, on June 5, 2023, filed a motion for judgment on the administrative record and accompanying exhibits.[4] (Doc. Nos. 1, 25.) Fox argues that the ALJ improperly evaluated his testimony about his disabling symptoms, improperly weighed medical opinions from an SSA consulting physician and Fox's treating physician, and failed to consider the impact of Fox's prescription drug use on his ability to find work. (Doc. No. 25.) He further argues that the ALJ who ruled on his first DIB application was "hostile and biased . . . ." (*Id.* at PageID# 1112.) Fox asks the Court to "approve[ ]" his

---

[4]     On June 5, 2023, the Court received an unsigned filing from Fox titled "Disability Insurance Benefits Claim" that includes twenty-one pages of exhibits. (Doc. No. 25.) The Court construed the filing as Fox's motion for judgment on the administrative record, ordered him to file an identical signed copy, and directed the Clerk of Court to substitute the signed copy for the unsigned copy on the docket upon receipt. (Doc. No. 26.) The Court received Fox's signed copy of this filing on June 23, 2023, and substituted it for the unsigned filing in the Court's docket. (Doc. No. 25.)

"disability request[,]" award him "full back pay" and "Social Security retirement payments[,]" and order the law firm that represented him in his first social security appeal to reimburse him for certain charges. (*Id.* at PageID# 1112–13.) In support of his arguments and requested relief, Fox attaches employment and medical records, online postings criticizing the first ALJ, and a billing statement from his former attorneys. (Doc. No. 25.)

The Commissioner filed a response in opposition to Fox's motion for judgment on the administrative record arguing that the Court should affirm the Commissioner's denial of Fox's second DIB claim because the ALJ complied with SSA regulations and substantial record evidence supports the ALJ's determinations. (Doc. No. 29.) The Commissioner further argues that the exhibits Fox attached to his motion do not support remanding his DIB claim to the SSA for consideration of new evidence and that there is no legal basis to support Fox's requests for retirement benefits or an order requiring his former attorneys to reimburse him for fees related to his first SSA appeal. (*Id.*)

Fox did not file an optional reply in support of his motion for judgment on the administrative record.

###    E.    Review of the Record

The ALJ and the parties have thoroughly described and discussed the medical and testimonial evidence in the administrative record. Accordingly, the Court will discuss those matters only to the extent necessary to address the parties' arguments.

## II.    Legal Standards

###    A.    Standard of Review

This Court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g); *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir.

6

2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009)). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co.*, 305 U.S. at 229); *see also Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014) (same). Further, "[t]he Social Security Administration has established rules for how an ALJ must evaluate a disability claim and has made promises to disability applicants as to how their claims and medical evidence will be reviewed." *Gentry*, 741 F.3d at 723. Where an ALJ fails to follow those rules or regulations, "we find a lack of substantial evidence, 'even where the conclusion of the ALJ may be justified based upon the record.'" *Miller*, 811 F.3d at 833 (quoting *Gentry*, 741 F.3d at 722).

### B.  Determining Disability at the Administrative Level

Fox applied for DIB under Title II of the Social Security Act, which is an insurance program that "provides old-age, survivor, and disability benefits to insured individuals irrespective of financial need." *Bowen v. Galbreath*, 485 U.S. 74, 75 (1988). To receive DIB, Fox must establish that he had a disability on or before the last date he was eligible for insurance under Title II, which is determined based on his earnings record. *See* 42 U.S.C. § 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.130. "Disability" in this context is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

7

ALJs must employ a "five-step sequential evaluation process" to determine whether a claimant is disabled, proceeding through each step until a determination can be reached. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ considers the claimant's work activity. *Id.* § 404.1520(a)(4)(i). "[I]f the claimant is performing substantial gainful activity, then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step two, the ALJ determines whether the claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. 20 C.F.R. § 404.1520(a)(4)(ii). "If the claimant does not have a severe impairment or combination of impairments [that meets the durational requirement], then the claimant is not disabled." *Miller*, 811 F.3d at 834 n.6. At step three, the ALJ considers whether the claimant's medical impairment or impairments appear on a list maintained by the SSA that "identifies and defines impairments that are of sufficient severity as to prevent any gainful activity." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); *see* 20 C.F.R. § 404.1520(a)(4)(iii). "If the claimant's impairment meets or equals one of the listings, then the ALJ will find the claimant disabled." *Miller*, 811 F.3d at 834 n.6. If not, the ALJ proceeds to step four. *Combs*, 459 F.3d at 643; *see also Walker v. Berryhill*, No. 3:16-1231, 2017 WL 6492621, at *3 (M.D. Tenn. Dec. 19, 2017) (explaining that "[a] claimant is not required to show the existence of a listed impairment in order to be found disabled, but such showing results in an automatic finding of disability and ends the inquiry"), *report and recommendation adopted*, 2018 WL 305748 (M.D. Tenn. Jan. 5, 2018).

At step four, the ALJ evaluates the claimant's past relevant work and "'residual functional capacity,' defined as 'the most [the claimant] can still do despite [his] limitations.'" *Combs*, 459 F.3d at 643 (first alteration in original) (quoting 20 C.F.R. § 404.1545(a)(1)); *see* 20 C.F.R. § 404.1520(a)(4)(iv). Past work is relevant to this analysis if the claimant performed the work

within the past 15 years, the work qualifies as substantial gainful activity, and the work lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b)(1). If the claimant's residual functional capacity (RFC) permits him to perform past relevant work, he is not disabled. *Combs*, 459 F.3d at 643. If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, "in light of [his] residual functional capacity, age, education, and work experience," a claimant can perform other substantial gainful employment. *Id.* While the claimant bears the burden of proof during the first four steps, at step five the burden shifts to the Commissioner to "identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011). "Claimants who can perform such work are not disabled." *Combs*, 459 F.3d at 643; *see also* 20 C.F.R. § 404.1520(a)(4)(v).

## III.  Analysis

Only some of the arguments in Fox's motion for judgment on the administrative record are properly before the Court. Section 405(g) provides the Court with authority to review "any final decision of the Commissioner of Social Security" and the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The only final decision before the Court in this action is the ALJ's February 20, 2019 written decision denying Fox's second DIB claim. (Doc. Nos. 1, 18.) Fox's argument that the ALJ who adjudicated his first DIB claim in 2007 was hostile and biased falls outside the scope of this Court's review because the 2019 written decision did not adopt or rely on the 2007 decision (AR 15) and because another district court has already considered and denied Fox's appeal of the 2007 decision, *see Fox*, 2010 WL 3220217, at *1–15. Fox's requests for an award of Social

Security retirement benefits and reimbursement of attorney's fees from his first social security appeal also fall outside the scope of relief that the Court can provide under § 405(g).

Fox's remaining arguments address the 2019 decision and are properly before the Court. Fox argues that the ALJ erred in analyzing his testimony about his disabling symptoms because the ALJ misstated Fox's age and placed too much emphasis on his ability to perform daily activities like riding a motorcycle and climbing a ladder at church to work on lighting. (Doc. No. 25.) He argues that the ALJ further erred by improperly evaluating medical opinions from an SSA consulting physician and from Fox's treating physician. (*Id.*) And Fox argues that the ALJ failed to properly consider the vocational expert's testimony that Fox's use of prescribed Oxycodone would prevent employers from hiring him. (*Id.*)

As a preliminary matter, the Court must determine whether it may consider documents Fox filed with his brief that were not included in the administrative record. The Commissioner argues that Fox has not shown that these documents "meet the standards for remand under sentence six of 42 U.S.C. § 405(g)" because "[t]hey are not new and material . . . ." (Doc. No. 29, PageID# 1106.) Fox has not asked the Court remand his claim to the SSA for consideration of these documents and so the Commissioner's argument is misplaced. Nevertheless, these documents "cannot provide a basis for reversing the Commissioner's decision as they were not part of the record that was before the ALJ." *Todd v. Comm'r of Soc. Sec.*, 44 F. App'x 690, 691 (6th Cir. 2002). The Court will therefore only consider the documents in the administrative record (Doc. No. 18) in addressing Fox's arguments.

The Court is mindful that the time period most relevant to Fox's second DIB application is from July 17, 2007, Fox's alleged disability onset date, to December 31, 2007, his date last insured. Considering medical records from the relevant time period, the parties' arguments, and the

10

administrative record as a whole, the Court finds that Fox has not carried his burden to show that the ALJ's decision lacks the support of substantial record evidence.

## A.     The ALJ's Analysis of Fox's Symptoms

Fox argues that the ALJ misstated his age and placed too much emphasis on his activities of daily living in evaluating Fox's alleged disabling symptoms. (Doc. No. 25.)

SSA regulations require an ALJ determining disability to "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). A two-step evaluation process governs this analysis. SSR 16-3p, 2016 WL 1119029, at *2–4 (Mar. 16, 2016). First, the ALJ determines "whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms . . . ." *Id.* at 2; 20 C.F.R. § 404.1529(b). If the ALJ finds that such an impairment exists, he must then "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the claimant's] ability to perform work-related activities . . . ." SSR 16-3p, 2016 WL 1119029, at *2; 20 C.F.R. § 404.1529(c). Factors relevant to evaluating the intensity, persistence, and limiting effects of an individual's symptoms include daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; any measures used to relieve the symptoms; and other factors concerning the claimant's functional limitations and restrictions due to those symptoms. SSR 16-3p, 2016 WL 1119029, at *7; 20 C.F.R. § 404.1529(c)(3)(i)–(vii).

Here, the ALJ began his analysis of Fox's subjective complaints by articulating the relevant two-part standard for assessing a claimant's symptoms. (AR 18.) The ALJ then analyzed Fox's testimony about his symptoms as follows:

11

The claimant was a 25-year-old male at the time of his date last insured and is alleging disability due to a combination of his physical and mental impairments, including spine impairments, right leg damage with artificial knee, CTS, and depression (Ex. B3E). He reports that his physical impairments caused fatigue, pain, and failing strength (Exs. B3E; B5E; Hearing Testimony). He testified that in the 5-month period ending in 2007, he was wobbling around in a walker and crutches using one hand, although he later indicated he was using a cane by his last Social Security hearing. Walking and standing were uncomfortable where he would have to change positions every 30 minutes, get up after an hour of sitting, or walk 15–20 minutes before needing to sit down. He also testified to using a traction collar for his neck at times depending on his pain level. Due to his mental impairments, the claimant alleges that he had difficulty with working with others. As far as treatment, the claimant states that his use of pain medications made him unemployable (Ex. B5E/9). He previously reported that he was taking Effexor and Wellbutrin for depression, and Mobic and oxycodone for pain (Ex. B15F/17).

In terms of activities of daily living, the claimant testified that he was able to drive some, but took naps for an hour or two. He also testified to certain activities after his date last insured, including climbing a ladder and drawing up plans for church stage work, driving his mother to the grocery store, attending church, going to the grocery store, bathing his dogs while sitting down, and doing wood work.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

The objective findings do not support the claimant's allegations of disabling symptoms and limitations for the period at issue. In terms of the claimant's musculoskeletal issues, the medical record shows the claimant was in a reported motorcycle accident in March 2004, sustained a fractured tibia and fibula, and underwent ORIF and right total knee replacement (TKR) (Exs. B1F/1; B15F/70). He also has a history of degenerative disc disease of the cervical spine and bilateral hand paresthesias (Ex. B15F/70). He was in another reported motor vehicle accident in June 2006 (Ex. B15F/55, 60).

In the year prior to his alleged onset date, a mid-2006 physical examination report did not document any particular observed abnormalities of the neck or back and mentions supple neck and no back tenderness. He moved slowly and deliberately but had 5/5 strength in all tested muscle groups, normal deep tendon reflexes, and normal coordination (Ex. B15F/26). An earlier 2006 consultative examination report also noted minimal loss of grip strength, mild to moderate loss of motor strength in the lower extremities, positive straight leg raises, and some limited spine and shoulder range of motion but otherwise normal range of motion in his other tested joints, including his elbows, wrists, and hands. He also could heel and toe

walk and walk unassisted, had a normal gait, used a cane for support, and could not stand on his heels and toes on tandem walk. However, no specific functional limitations in terms of work activity were noted on exam. (Ex. B14F/63–67). By fall 2006, rehabilitation office visits indicate he was doing very well following the accident and was almost back to baseline. He still had some pain but Mobic and oxycodone were particularly effective in controlling his overall pain when absolutely necessary for severe intractable pain. (Ex. B15F/54). He exhibited limited neck and lumbar spine range of motion, but also intact gait, intact coordination, and symmetric motor strength and reflexes (Ex. B15F/55).

October 2007 orthopedic notes mention limb-length-inequality with his right leg approximately 1 inch shorter than the left, mild prolapse along the medial joint line with valgus stressing of the right knee, and an antalgic gait. However, he was able to extend the right knee to within a few degrees of full extension, had intact ligaments are intact [*sic*], no observed lower extremity motor or sensory deficits, 2+ equal pedal pulses, and negative Patrick's test (Ex. B6F/8). In terms of treatment, he was prescribed 15mg of Mobic daily (Ex. B6F/8). The orthopedist recommended returning in one year for reassessment and prescribed him a right shoe heel-build up (Ex. B6F/9).

Even well after the claimant's date last insured, the claimant has exhibited normal gait, normal strength, and normal range of motion except some decreased cervical range of motion (Ex. B4F/4). A mental health provider also noted in fall 2008 that he ambulated independently, was independent in activities of daily living, and did not mention any observed pain behaviors other than verbal report (Ex. B5F/20). A fall 2008 orthopedic report also noted he was doing well overall. He reportedly had some occasional right hip and low back pain, and occasional stiffness when he first gets up, but the stiffness improved with ambulation (Ex. B6F/7). Late 2008 and 2009, x-rays showed good positioning of the orthopedic hardware where there was essentially no radiographic changes since his October 2007 x-ray (Ex. B6F/6, 7). He also ambulated independently with some left knee complaints from time to time, but had full right knee range of motion, which the orthopedist found quite impressive (Ex. B6F/6, 7).

Based on this discussion of the medical evidence, a limitation on the claimant to a light exertion level with additional restrictions on standing, walking, postural, and manipulative activities and exposure to environmental factors as found in this decision accounts for the claimant's severe physical medically determinable impairments and associated symptoms and medication side effects for the period at issue. A limitation to unskilled work as found in this decision also accounts for medication side effects.

In terms of the claimant's alleged mental impairments, the medical record shows he has a history of some mental health treatment for depression and/or anxiety with prescribed medication (Ex. B13F/1, 12). In the years leading up to his alleged onset date, physical examination reports did not document any particular observed mental abnormalities and rather mention pleasant appearance, good attention to hygiene,

normal mood and affect, and appearing in no apparent distress (Ex. B15F/26, 27, 30).

Psychiatric treatment notes from September 2007 mention reported ups and downs, but also euthymic mood and no suicidal ideation. His major depressive disorder was considered mild to moderate and treatment continued with prescribed Effexor and Wellbutrin and plans to return to the clinic in 4 months. (Ex. B5F/24). Even about a month after the claimant's date last insured, progress notes show he had no major complaints, exhibited euthymic mood, and had no overtly manic of [sic] psychotic symptoms (Ex. B5F/23). Treatment continued with prescribed medication and plans to return in 4 months (Ex. B5F/23).

There is then a gap in treatment records where even in fall 2008, despite fatigue/poor energy level and had [sic] anxious, depressed, and irritable/agitated mood, he exhibited normal thought process/content, excellent eye contact, full affect, and orientation to 4 spheres (Ex. B5F/20). His provider also gave him a Global Assessment of Functioning (GAF) score of 70 (Ex. B5F/21).

After his date last insured, physical examination reports continued to document normal mental observations, including grossly intact cognition, linear and logical thought process, and/or intact memory, judgment, and insight. (Exs. B4F/4; B9F/9, 10, 17, 31, 45, 60, 63; B11F/6).

Based on this discussion of the medical evidence, a limitation on the claimant to unskilled work as found in this decision adequately accounts for the claimant's severe mental impairment.

As for the claimant's statements about the intensity, persistence, and limiting effects of his symptoms, they are not entirely consistent or supported by the record of evidence, and are contradicted by treatment notes and examining source opinions. The claimant did undergo knee surgery, which certainly suggests that the symptoms were genuine. While that fact would normally weigh in the claimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving the symptoms. Treatment for physical and mental symptoms since then has essentially been routine and conservative in nature. Mental health treatment was also limited with prescribed medication and visits about every 4 months around his date last insured. In light of examination findings showing some abnormal mood and varied but independent gait with some leg discrepancy and limited range of motion but otherwise normal strength and sensation, such treatment history does not suggest the presence of impairments that are more limiting than found in this decision for the period at issue. Although the claimant alleged various side effects from the use of medications, the record indicates generally that those side effects were mild and have been accounted for in limiting the claimant to unskilled work with restrictions on exposure to hazards.

A district court decision also notes the claimant purchased a new motorcycle in November 2006, which suggests he was not as limited as alleged (Ex. B2A/10).

The claimant denied that the motorcycle was his, and said it was his wife's (Ex. B12F/48). However, he also reported activities since his date last insured that indicate he did not have limitations greater than found in this decision for the period at issue. He reported working on a ladder for lighting work at his church in late 2015 (Ex. B9F/56), building a sunroom and painting his house in early 2016 (Ex. B9F/46, 49), and using a table saw in fall 2017 (Ex. B9F/16). Overall, the claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations for the period at issue.

(AR 18–21.)

Fox raises two objections to this analysis on appeal. (Doc. No. 25.) First, he argues that the ALJ incorrectly stated that Fox was twenty-five years old instead of his correct age of fifty-two. (*Id.*) The Commissioner has not responded to this argument. However, based on the administrative record, there is no dispute that Fox was fifty-two years old on his date last insured. Indeed, the ALJ found elsewhere in his written decision that Fox "was born on April 3, 1955 and was 52 years old . . . on the date last insured." (AR 23 (citation omitted).) The ALJ's incongruous statement that Fox was a "25-year-old male" thus appears to be an accidental transposing of digits. Fox has not presented any argument or authority supporting his assertion that this minor error warrants reversal or remand, and the Court finds that it was, at most, harmless error. *See, e.g.*, *Smith v. Astrue*, No. 1:09-cv-2130, 2011 WL 1043342, at *9 n.4 (N.D. Ohio Mar. 18, 2011) (finding that ALJ's "inadvertent transposition" of numbers was "clearly a typo" and, "at most, harmless error" that did not warrant remand).

Fox next argues that the ALJ placed too much emphasis on his daily activities, including the fact that Fox obtained a motorcycle in 2006 and that Fox climbed a ladder at church. (Doc. No. 25.) Fox states that the motorcycle was "not a normal motorcycle, but a trike with three wheels that does not require being held up." (*Id.* at PageID# 1110.) He maintains that "[l]ots of handicap[ped] riders use trikes" and that he "was not able to handle a normal motorcycle." (*Id.*) While Fox concedes that he once "climbed a step ladder at church trying to fix something[,]" he

states that he "shouldn't have done it and [ ] paid for it by falling off and breaking [his] ankle." (*Id.* at PageID# 1111.)

The Commissioner has not disputed Fox's assertions that the motorcycle had three wheels or that Fox fell from the ladder at church and broke his ankle, and Fox's medical records confirm that he broke his ankle after reportedly falling from a ladder at his church. (AR 365–66, 435.)

Considering the record evidence as a whole, Fox has not shown that the ALJ applied the incorrect legal standard in evaluating his alleged symptoms or that the ALJ's findings lack the support of substantial record evidence. Contrary to Fox's argument, the record shows that the ALJ placed little emphasis on the motorcycle or the ladder incident. Instead, the ALJ mentioned these activities in passing alongside a thorough summary of Fox's medical records from 2004 to 2009, including a discussion of the objective medical findings regarding Fox's physical and mental impairments, his prescribed treatments and medications and their effects, and his other daily activities, including driving, going to the grocery store, taking his mother to the grocery store, attending church, bathing his dogs while sitting, and wood working. (AR 18–21.)

Fox therefore has not shown that reversal or remand is warranted on this ground.

### B.    The ALJ's Evaluation of Medical Opinion Evidence

Fox argues that the ALJ gave too much weight to a consulting medical opinion from Nancy Kopitnik, D.O., while improperly discounting a medical opinion from Fox's own doctor, Anju Sharma, M.D. (Doc. No. 25.)

The SSA regulations governing DIB claims filed before March 27, 2017, promise DIB claimants that the SSA "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence" and, "[r]egardless of its source, [ ] will evaluate every medical opinion [it] receive[s]." 20 C.F.R. § 404.1527(b), (c). The regulations further provide that

an ALJ must give special consideration to medical opinions from a claimant's treating physician.[5] Specifically, an ALJ must give controlling weight to a treating physician's opinion regarding the nature and severity of a claimant's condition or RFC if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record[.]" 20 C.F.R. § 404.1527(c)(2); *accord Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also Gentry*, 741 F.3d at 727 (holding that "[t]he treating physician rule also applies to the RFC of the claimant"). The rationale behind the rule is that a treating source's opinion is most likely "to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 404.1527(c)(2).

An ALJ's finding that a treating physician's opinion is not entitled to controlling weight—either because it is not well-supported by medically acceptable evidence and techniques or because it is inconsistent with the substantial evidence in the record—does not mean that the ALJ should reject the opinion entirely. "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). In weighing a non-controlling treating physician's opinion, the ALJ must consider the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record, the specialization of the treating source, and any other relevant factors. *Gentry*, 741 F.3d at 727 (quoting *Wilson v. Comm'r of Soc. Sec.*,

---

[5]     A treating physician is an "acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2).

378 F.3d 541, 544 (6th Cir. 2004)); 20 C.F.R. § 404.1527(c)(2)–(6). "The ALJ need not perform an exhaustive, step-by-step analysis of each factor; she need only provide 'good reasons' for both her decision not to afford the physician's opinion controlling weight and for her ultimate weighing of the opinion." *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 785 (6th Cir. 2017), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019). Such reasons must be "supported by the evidence in the case record[ ] and . . . sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5.

### 1. Kopitnik's Report

Kopitnik examined Fox on December 27, 2005, and submitted an examination report in connection with his first DIB application. (AR 96, 721–25.) Her report was a part of the administrative record in Fox's first DIB appeal, but that record "was destroyed according to [SSA] policy" before Fox filed his second DIB application. (AR 13.) The administrative record in this action contains a "corrected copy" of Kopitnik's "Disability Physical Examination" report dated January 24, 2006, but the copy is blurry and difficult to read. (AR 721–25.) The ALJ analyzed Kopitnik's report as follows:

> As for the opinion evidence, the undersigned gives some weight to the examination report of Nancy Kopitnik, D.O., who noted no specific functional limitations in terms of work activity in a January 2006 examination report, but also noted that the claimant had minimal loss of grip strength, mild to moderate loss of motor strength in the lower extremities, positive straight leg raises, and some limited spine and shoulder range of motion with otherwise normal range of motion in other tested joints, ability to heel and toe walk, normal gait, use of a cane, and inability to stand on heels and toes on tandem walk. (Ex. B14F/63–67). This report predates the period at issue, but the examination findings indicate the claimant has no greater limitations than has been assessed in this decision for the period at issue. Accordingly, some weight is given to Dr. Kopitnik's statements.

(AR 21.)

Fox argues that the ALJ placed too much emphasis on Kopitnik's opinion because "Kopitnik performed [a]n inadequate exam . . . ." (Doc. No. 25, PageID# 1111.) He states that Kopitnik's office "messed up [Fox's] exam date and time, so when [he] got there the doctor saw [him] in-between her other patients for the day and [he] was in her office for six hours not getting the attention [his] exam should have gotten." (*Id.*) Fox further argues that Kopitnik initially "filed an evaluation that was incomplete and incorrect" and "later reentered into evidence a new evaluation that basically g[a]ve [Fox] a perfect bill of health . . . but was totally made up instead of having [him] come back and do a proper exam." (*Id.*) Fox argues the ALJ erred by "still [giving] weight to this perjury evaluation by Dr. Kopitnik." (*Id.*)

The Commissioner responds that there is no record evidence to support Fox's assertion that Kopitnik falsified her report. Instead, the Commissioner argues, substantial record evidence supports the ALJ's analysis of Kopitnik's report because the ALJ gave the report only "some weight[,]" noting "the fairly normal objective evidence obtained by the doctor" and recognizing that the examination and report predated Fox's disability onset date. (Doc. No. 29, PageID# 1102.)

Fox does not identify any specific portions of Kopitnik's report that he alleges are fabricated or incorrect. Instead, he argues generally that the report is "totally made up" and "perjur[ed.]" (Doc. No. 25, PageID# 1111.) "In this circuit, it is well-settled that '[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.'" *Jones v. Berryhill*, 392 F. Supp. 3d 831, 841 (M.D. Tenn. 2019) (alterations in original) (quoting *Rogers*, 486 F.3d at 247). Because his statements regarding Kopitnik's report are general and conclusory, Fox has not carried his burden

to show with specificity that the ALJ's analysis of Kopitnik's report violates SSA rules or lacks the support of substantial record evidence.

### 2. Sharma's Opinions

Sharma specializes in rehabilitation medicine, and he began treating Fox in 2005 for injuries and pain related to Fox's 2004 motorcycle accident. (AR 812–14.) Sharma completed physical capacity evaluation forms for Fox in October 2005 and February 2007 in connection with Fox's first DIB application. (AR 328–31, 779–81.) He listed Fox's diagnoses as chronic pain syndrome, lumbar and cervical spine problems, status post total knee replacement, carpal tunnel syndrome, and depression. (AR 328, 779.) Sharma opined that Fox could occasionally lift and carry up to ten pounds; could sit, stand, and walk for one hour each in an eight-hour workday; could never crawl but could occasionally or seldom push and pull while seated or standing, bend, squat, climb, and reach above shoulder level; and could not use his hands for simple grasping, firm grasping, or fine manipulation. (AR 328–29, 779–80.) Sharma further opined that Fox's pain would affect his ability to concentrate in a work setting and that, considering his medical conditions, he was disabled and unable to work. (AR 330, 781.)

The administrative record also contains a prescription pad note that Sharma wrote in 2018 in connection with Fox's second DIB application. (AR 508.) The note states that Fox has been "permanent[ly] [and] totally disabled from" February 2007 through December 2007 "while under [Sharma's] care." (*Id.*)

The ALJ analyzed Sharma's opinions as follows:

The undersigned gives little weight to the opinion of treating physician Anju Sharma, M.D., who opined on October 17, 2005 and February 2007 that the claimant is disabled and has not been able to return to work. The doctor specifically opined the claimant had lift and carry abilities consistent with sedentary work, an ability to sit, stand, and walk only 1 hour each, occasional or seldom postural activities (except no crawling in the 2007 opinion), occasional reaching above shoulder level, and no restrictions on listed environmental factors (Exs. B2F;

20

B15F/47–50). Dr. Sharma cited to chronic pain syndrome, cervical spine issues, status post total knee replacement, and bilateral CTS with pain, spasms, tenderness, numbness and/or tingling, decreased neck and shoulder range of motion, and pain that would affect his concentration. The doctor further noted depression, sleep disturbance, and decreased energy (Ex. B2F/1, 3). The doctor later stated in September 2018 that the claimant was permanently and totally disabled from February 2007 while under the doctor's care (Ex. B10F). While there was a treating relationship with the claimant, whether the claimant is disabled or can work is an issue reserved to the Commissioner (20 CFR 404.1527(d)). Moreover, the opinions are contradicted by examination findings that he was ambulating independently and had normal strength and sensation /no motor or sensory deficits, and medical imaging reports showing stable radiological findings after TKR (Exs. B5F/20; B6F/6–9). A district court opinion also notes the claimant had a new motorcycle in 2006 (Ex. B2A) and he has engaged in a variety of activities since his DLI inconsistent with Dr. Sharma's extreme limitations (Exs. B9F/16, 46, 49, 56; Hearing Testimony). Accordingly, little weight is given to Dr. Sharma's opinion.

(AR 21–22.)

Fox raises two objections to this analysis on appeal. First, he argues that the ALJ improperly discounted Sharma's opinion based on Fox's use of a motorcycle. (Doc. No. 25.) Second, Fox argues that the ALJ should have given "even more weight" to Sharma's opinion because the SSA "failed to have [Fox] come for [an] evaluation by their [consulting] doctors" in connection with his second DIB application. (*Id.* at PageID# 1112.)

The ALJ provided sufficient reasons for not giving Sharma's opinions controlling weight. The ALJ's treating-physician analysis follows the ALJ's analysis of Fox's symptoms, which includes a thorough summary of Fox's medical history from 2004 to 2008, including diagnoses, treatments, and examination findings. (AR 18–21.) With that context, the ALJ characterized Sharma's opined limitations as "extreme" and inconsistent with "examination findings that [Fox] was ambulating independently and had normal strength and sensation /no motor or sensory deficits, and medical imaging reports showing stable radiological findings after [total knee replacement.]" (AR 22.) Only after that analysis did the ALJ address the district court opinion denying Fox's first social security appeal, which "notes [that] [Fox] had a new motorcycle in 2006

and [ ] ha[d] engaged in a variety of activities since his [date last insured] inconsistent with Dr. Sharma's extreme limitations." (*Id.* (citations omitted).) This statement was not determinative in the ALJ's analysis.

Further, Fox has not offered any authority to support his argument that Sharma's opinions are entitled to greater weight because the SSA did not conduct a new consulting examination after Fox reapplied for DIB benefits in 2017. Nor has he made any argument as to why a consulting examination performed nearly a decade after his date last insured would be relevant to his DIB claim.

For these reasons, Fox has not shown that the ALJ violated the treating physician rule or that the ALJ's analysis of Sharma's medical opinions lacks the support of substantial record evidence.

**C.    The ALJ's Consideration of Fox's Prescription Drug Use**

Fox's last remaining argument is that the ALJ erred in finding that Fox could perform work that exists in the national economy despite his prescribed drug use. (Doc. No. 25.)

During the administrative hearing, Fox testified that he has "been taking Oxycodone since 2004" and that he takes "heavier doses now because [he] ha[s] gotten used to it." (AR 62.) He stated that he takes "at least one . . . dose" of "Oxycodone almost every day," but he "tr[ies] to be real careful with it because [he] know[s] how addictive it can be and . . . [he] ha[s] to wean [himself] off of it by reducing the dosage and spacing it out because [he] can't just quit." (AR 66.) The ALJ asked Fox if, "back in 2007[,] [Fox] could [ ] have done a simple job while on Oxycodone" and Fox replied, "No. Who would want to hire somebody that is on drugs?" (*Id.*) When the vocational expert testified at the administrative hearing, Fox asked her whether he was "employable" even though he was taking Oxycodone, Ritalin, and Lorazepam:

CLMT: What about the medications I take, am I employable, Oxycodone, Ritalin?

ALJ: Well, she's --

CLMT: Lorazepam.

ALJ: Ms. Berkshire, are you able to answer that question?

VE: Well, I am not here as a medical expert but yes, I can. And the prescriptions that Mr. Fox is taking would not allow him to work in a general labor force. First of all, you know there is an issue of how those medicines are going to react with an individual and cause problems on the job, which is more of a medical issue. However, on a vocational issue, someone who is taking those types of medicines, would not be able to pass a drug test.

ALJ: All right. So employers will not hire someone who is on Oxycodone or Ritalin.

VE: No. Ritalin is not an issue. Oxycodone is an issue.

CLMT: Lorazepam.

ALJ: Lorazepam, are you familiar with that one?

VE: I am and I am not real sure on that. I don't know. I am not sure how employers would react with that. Actually, it is not Ambien. It is not the employer that -- the employer doesn't know or isn't aware of the medications that the individual is taking unless the individual provides that information. However, the drug testing facility is going to know and they would require the potential worker to fill out a form or piece of paper saying what are you taking and then that individual would write those medications down. Then the drug testing place would make a recommendation to the employer. Yes, this person should be hired or no, this person should not be hired.

ALJ: All right. There is a distinction, Mr. Fox, between the ability to be hired and the ability to do the job and that is something that I may have to look at but I do understand your testimony about the effects on your functioning that these medications have. I am going to be looking at that, taking that into consideration . . . .

(AR 84–85.)

In analyzing Fox's prescription drug use, the ALJ acknowledged Fox's testimony that he took "Mobic and oxycodone for pain" and "that his use of pain medications made him unemployable." (AR 19 (citations omitted).) However, the ALJ found that Fox's medical records show that, "[b]y fall 2006, . . . Mobic and oxycodone were particularly effective in controlling

[Fox's] overall pain when absolutely necessary for severe intractable pain." (*Id.*) The ALJ further found that "October 2007 orthopedic notes mention" that Fox only "was prescribed 15mg of Mobic daily." (AR 20 (citation omitted).) The ALJ therefore concluded that, "[a]lthough [Fox] alleged various side effects from the use of medications, the record indicates generally that those side effects were mild and have been accounted for in limiting [Fox] to unskilled work with restrictions on exposure to hazards." (AR 21.)

Fox argues that the vocational expert "agreed with [him] that taking Oxycodone, a[n] opioid drug, would be a work/hiring problem" because he "could not pass a drug test for employment[,]" and that it was therefore "totally contradictory" for the vocational expert and the ALJ to find that Fox is "employable to certain jobs . . . ." (Doc. No. 25, PageID# 1112.) The Commissioner responds that SSA regulations do not allow ALJs to consider "the hiring practices of individual employers" in determining whether or not an individual is disabled. (Doc. No. 29, PageID# 1104 (citing 20 C.F.R. § 404.1566(a)).)

The Commissioner is correct that SSA regulations prohibit ALJs determining disability from considering whether an individual "would be hired if [he] applied for work." 20 C.F.R. § 404.1566(a)(3). The regulations further provide that the SSA "will determine that [a claimant] [is] not disabled if [his] residual functional capacity and vocational abilities make it possible for [him] to do work which exists in the national economy, but [he] remain[s] unemployed because of "[his] inability to get work;" "[t]he hiring practices of employers;" or evidence that "[he] would not actually be hired to do work [he] could otherwise do[.]" *Id.* § 404.1566(c)(1), (3), (7). Under these regulations, an ALJ may not consider the claimant's ability, or inability, to pass an employer's drug screening test in determining whether the claimant is disabled under the Social Security Act. *Miller v. Astrue*, No. 1:12CV148, 2012 WL 6607006, at *16 (N.D. Ohio Nov. 26,

2012); *cf. Kass v. Kijakazi*, No. 22-CV-01062, 2023 WL 5310445, at *6 (E.D.N.Y. Aug. 17, 2023) (finding that opioid use does not have special relevance in determining whether an individual is disabled). In other words, the ALJ could only consider whether and what work Fox could do, not whether employers would be likely to hire Fox to do that work.

SSA regulations do permit ALJs determining disability to consider any side effects a claimant experiences from taking medications in the context of addressing the claimant's disabling symptoms. 20 C.F.R. § 404.1529(c)(3)(iv). Here, in addressing Fox's symptoms, the ALJ considered Fox's allegations "that his use of pain medications made him unemployable" and that he experienced "various side effects from the use of medications[.]" (AR 19, 21.) The ALJ concluded, however, that "the record indicates generally that those side effects were mild . . . ." (AR 21.)

Fox has not identified any record evidence to contradict the ALJ's finding that Fox experienced only mild medication side effects during the relevant time period. Moreover, the ALJ found that, in the fall of 2006, Fox only took Oxycodone "when absolutely necessary for severe intractable pain" and that, by October 2007, the only pain medication mentioned in Fox's medical records was Mobic. (AR 19–20.) These findings are substantially supported by record evidence. Treatment notes from a November 15, 2006 appointment with Sharma state that Fox reported that "[h]e only uses the oxycodone when absolutely necessary for severe intractable pain" and that the "Mobic and oxycodone combination have been particularly effective in controlling his overall pain." (AR 782.) Treatment notes from Fox's appointment with Nature Coast Orthopaedics on October 25, 2007, which falls within the time period most relevant to Fox's disability, show that Fox did not report taking Oxycodone at all. Instead, Fox reported taking "Effexor 2 25 mg daily; Wellbutrin 400 mg daily; medication for lowering his cholesterol, of which he is unsure of it's

[*sic*] name; and Mobic 15 mg daily." (AR 369.) Fox has not identified any conflicting record evidence. He points to a list of his prescribed medications dating back to 2015 that includes Oxycodone (Doc. No. 25, PageID# 1110), but these records do not address whether and what dosage of Oxycodone Fox took during the relevant 2007 time period and what, if any, side effects he experienced as a result. (AR 495–506.)

Fox therefore has not shown that the ALJ's consideration of his prescription drug usage violated SSA regulations or otherwise lacked the support of substantial record evidence.

## IV.  Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that Fox's motion for judgment on the administrative record (Doc. No. 25) be DENIED and that the Commissioner's final decision be AFFIRMED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 18th day of January, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge